1  P. CRAIG CARDON, Cal. Bar No. 168646
   BRIAN D. ANDERSON, Cal. Bar No. 221645
2  JANENE P. BASSETT, Cal. Bar No. 197722
   SHEPPARD MULLIN RICHTER & HAMPTON LLP
3  1901 Avenue of the Stars, Suite 1600
   Los Angeles, California  90067-6017
4  Telephone:  310-228-3700
   Facsimile:  310-228-3701
5
   TAWNYA WOJCIECHOWSKI, Cal. Bar No. 180063
6  RAFAEL G. NENDEL-FLORES, Cal. Bar No. 223358
   SHEPPARD MULLIN RICHTER & HAMPTON LLP
7  650 Town Center Drive, 4th Floor
   Costa Mesa, California  92626-1993
8  Telephone:  714-513-5100
   Facsimile:  714-513-5130
9
   Attorneys for Plaintiff
10 DREAM STAGE ENTERTAINMENT, INC.

11

12              UNITED STATES DISTRICT COURT

13     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

14                      CV04-9680 JFW (Mcx)

15 DREAM STAGE ENTERTAINMENT,          Case No.
   INC., a Japanese Corporation,
16
                 Plaintiff,            **COMPLAINT FOR:**
17
           v.                          **1. BREACH OF CONTRACT;**
18
   ROYCE GRACIE, an Individual         **2. BREACH OF IMPLIED**
19 domiciled in California; FEG, INC, a **COVENANT OF GOOD FAITH**
   Japanese Corporation,               **AND FAIR DEALING; AND**
20
                 Defendants.           **3. INTENTIONAL**
21                                      **INTERFERENCE WITH**
                                        **CONTRACTUAL RELATIONS.**
22

23
                                       [DEMAND FOR JURY TRIAL]
24

25

26

27

28

W02-SF:5BA1\61436110.2                -1-                      **COMPLAINT**

11/29/2004 1:56:26 PM  Receipt #: 18398
          Cashier : ABELLAMY [LA 2-1]
Paid by: WORLDWIDE NETWORK INC
2:CV04-09680
2005-086900        5 - Filing Fee Civil(1)
Amount :                          $60.00
2:CV04-09680
2005-510000       11 - Special Fund F/F(1)
Amount :                          $90.00
Check Payment : 27873 /          150.00
Total Payment :                  150.00

1  Plaintiff Dream Stage Entertainment, Inc., for its claims of relief against
2  Defendants Royce Gracie and FEG, Inc., alleges as follows:

3  **THE PARTIES**

4  1.  Plaintiff Dream Stage Entertainment, Inc. ("Dream Stage") is a
5  Japanese corporation engaged in the business of arranging, promoting, broadcasting,
6  and distributing mixed martial arts fighting events, and distributing various media,
7  including free and pay-per-view television broadcasts, videotapes and DVDs, in the
8  field of mixed martial arts fighting events.

9  2.  Royce Gracie, an individual domiciled in Torrance, California, is a
10  master grappler of Brazilian Jiu-Jitsu who competes in mixed martial arts fighting
11  events.  He became internationally famous in the sports of Jiu-Jitsu and mixed
12  martial arts fighting by winning three Ultimate Fighting Championship titles.  Mr.
13  Gracie reached iconic status when he became the first fighter ever inducted into the
14  Ultimate Fighting Championship Hall of Fame.

15  3.  Defendant FEG, Inc. ("FEG") is a Japanese corporation engaged in the
16  business of arranging, promoting, broadcasting, and distributing mixed martial arts
17  fighting events.  FEG, doing business as "K-1," was known more for stand up
18  fighting, or kickboxing, and has only recently entered the mixed martial arts field
19  (ground and stand up, differs from kickboxing) as a result of the success achieved
20  by Dream Stage.

21  **JURISDICTION AND VENUE**

22  4.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §
23  1332, as this is a civil action between citizens of different countries in which the
24  amount in controversy exceeds $75,000, exclusive of interest and costs.

25  5.  Venue of this action lies in the Central District of California pursuant to
26  28 U.S.C. § 1391(a)(2), in that a substantial portion of the events or omissions
27  giving rise to the claims for relief set forth in this Complaint occurred in the County
28  of Los Angeles, California; Mr. Gracie and his various business ventures are

1   domiciled in Torrance, California; and the contract that is the subject matter of this
2   Complaint, to which Mr. Gracie is a party, is governed by California law.

3                              **GENERAL ALLEGATIONS**

4        6.    On information and belief, FEG's "K-1" brand of mixed martial arts
5   fighting events was the premier brand in the sport for many years.  Recently, FEG
6   has had less success as newer companies, such as Dream Stage, have entered and
7   successfully competed against FEG in the market.

8        7.    On information and belief, part of the business of both FEG and Dream
9   Stage is to promote mixed martial arts fighting events on New Year's Eve in Japan.
10  In Japan, more people watch television on New Year's Eve than on any other day of
11  the year.  These mixed martial arts fighting events, which are broadcast both on free
12  and pay-per-view television throughout the world, are very popular in Japan, as is
13  the status and goodwill associated with promoting a major fight on that night.

14       8.    Signing Mr. Gracie to fight in Japan on New Year's Eve would be a
15  major milestone event and public relations coup for either FEG or Dream Stage.
16  Mr. Gracie's services are very special and unique.   Few fighters are as
17  internationally famous as Mr. Gracie.  Mr. Gracie fights using a unique form of Jiu-
18  Jitsu that was originally developed by his father, Helio Gracie.  Mr. Gracie is the
19  only fighter in the sport who fights using this form of Jiu-Jitsu, which is distinctive
20  because it allows the fighter to defeat much larger opponents.

21       9.    On or around December 30, 2003, Dream Stage and Mr. Gracie entered
22  into the Martial Arts Performance Agreement (the "Agreement") pursuant to which
23  Mr. Gracie agreed to fight in a mixed martial arts fighting event in Japan on New
24  Year's Eve, December 31, 2003, promoted by Dream Stage.  Signing Mr. Gracie to
25  fight in an event in Japan on New Year's Eve was a major success for Dream Stage.

26       10.   The Agreement is more than a contract for a single fight.  A critical
27  element of the Agreement is a right of first refusal, which gives Dream Stage the
28  opportunity to promote a Gracie fight on December 31, 2004 should Gracie fight on

1   that night.  Specifically, Section 5 of the Agreement provides Dream Stage, for one

2   year, with the right of first refusal regarding any offer made by a third party during

3   that period to Mr. Gracie to fight in Japan.  Section 5 of the Agreement provides:

4   <u>Right of First Refusal/Matching Right</u>. For one year following

5   the [December 31, 2003 event], [Mr. Gracie] agrees to give

6   [Dream Stage] 10 business days prior written notice of the

7   material terms of any bona fide offer from any third party to

8   perform in any MATCH in Japan, and give [Dream Stage] the

9   opportunity to conduct such match on substantially similar

10   material terms.   Any of such MATCHES shall be conducted

11   pursuant to the terms and conditions as provided herein, and all

12   rights, obligations, requirements and remedies herein shall be

13   completely and entirely applicable to each MATCH in which

14   [Mr. Gracie] participates.

15
16   11.    The right of first refusal is important to Dream Stage because of Mr.

17   Gracie's star power in the sports of Jiu-Jitsu and mixed martial arts fighting and his

18   ability to attract a large viewer audience for the broadcast in Japan on New Year's

19   Eve.  Indeed, Dream Stage paid Mr. Gracie a premium for the right of first refusal.

20   Dream Stage's express purpose in obtaining the right of first refusal was to

21   guarantee that if Mr. Gracie appeared in a fight in Japan on New Year's Eve 2004,

22   the fight would be promoted by Dream Stage.  While promoting a Gracie fight on

23   New Year's Eve two years in a row would increase and strengthen the goodwill and

24   reputation of the promoter by creating a close association in the minds of viewers

25   with Mr. Gracie, a "one-off" fight with a different company promoting a fight on the

26   following New Year's Eve would not have anywhere near the same effect on the

27   promoter's goodwill and reputation.  Accordingly, Dream Stage securing the right to

28

1 | promote Mr. Gracie two years in a row (if he fought), was an opportunity to greatly
2 | raise its status and reputation.

3 |      12.   On information and belief, at all relevant times, FEG was aware of the
4 | Agreement between Dream Stage and Mr. Gracie, including Dream Stage's right of
5 | first refusal pursuant to Section 5 of the Agreement. Such provisions are common
6 | in fight agreements in this industry, and FEG knew that Mr. Gracie fought on
7 | December 31, 2003 in an event promoted by Dream Stage.

8 |      13.   On or around October 22, 2004, during the one year right of first
9 | refusal period, Dream Stage's local counsel in Japan, Michael Connette, received a
10 | vague, incomplete document labeled "Letter of Intent" (the "Letter of Intent") from
11 | Mr. Gracie's business manager, Michael Kogan, who at all relevant times was acting
12 | as Mr. Gracie's agent. Mr. Gracie, through his agent, represented to Dream Stage
13 | that the Letter of Intent was a "bona fide offer" from FEG to Mr. Gracie to fight in
14 | three fights in Japan, including one on December 31, 2004.

15 |      14.   If the Letter of Intent was a bona fide offer, Dream Stage would have
16 | 10 business days from proper notice to exercise its right of first refusal pursuant to
17 | Section 5 of the Agreement. Dream Stage, however, reasonably doubted that the
18 | Letter of Intent was a bona fide offer because the document, on its face, suggested
19 | that FEG was expecting additional negotiations and term changes and therefore the
20 | document did not appear to give Mr. Gracie the power to bind FEG by his
21 | "acceptance." To Dream Stage, the Letter of Intent was merely an indication of
22 | FEG's willingness to negotiate with Mr. Gracie regarding a possible event in Japan
23 | on December 31, 2004, not a bona fide offer.

24 |      15.   On or around October 25, 2004, Mr. Connette sent Mr. Gracie's agent,
25 | Mr. Kogan, an e-mail documenting their telephone conversation earlier that day. In
26 | the e-mail, Mr. Connette states that he and Mr. Kogan agreed that the Letter of
27 | Intent was not a bona fide offer as required by Section 5 of the Agreement. Mr.
28 | Connette asked Mr. Kogan to obtain a bona fide offer from FEG regarding Mr.

1    Gracie fighting in an event in Japan on December 31, 2004 and to provide written
2    notice of the material terms of such an offer to Dream Stage.  Mr. Connette
3    reiterated that Dream Stage would then have 10 business days to exercise its right of
4    first refusal under Section 5 of the Agreement.

5          16.    On or around October 25, 2004, Mr. Kogan replied to Mr. Connette's e-
6    mail of the same date, stating that although he believes that the Letter of Intent is a
7    bona fide offer, he acknowledges that Dream Stage disagrees with this conclusion.
8    Mr. Kogan then promised to obtain and provide Dream Stage with a bona fide offer
9    from FEG regarding Mr. Gracie fighting in an event in Japan on New Year's Eve
10   2004.

11         17.    On or around October 27, 2004, Mr. Gracie's agent sent Mr. Connette
12   by e-mail a second vague, incomplete document—this document was entitled
13   "Revised Agreement" (the "FEG Document").  Mr. Gracie's agent represented to
14   Dream Stage that the FEG Document was a bona fide offer from FEG to Mr. Gracie
15   to fight in an event in Japan on December 31, 2004.

16         18.    If the FEG Document was a bona fide offer, Dream Stage would have
17   10 business days from proper notice to exercise its right of first refusal pursuant to
18   Section 5 of the Agreement.  Dream Stage still had reasonable doubts regarding
19   whether the FEG Document was a bona fide offer because, like the Letter of Intent,
20   the FEG Document stated that the terms were not set and additional changes and
21   terms would be forthcoming.  Therefore the document did not appear, on its face, to
22   give Mr. Gracie the power to bind FEG by his "acceptance."  Moreover, the FEG
23   Document provided that Mr. Gracie would receive a purse of U.S. $2,000,000 per
24   fight for three fights (which is more than four times the purse Mr. Gracie received
25   (U.S. $480,000) for the New Year's Eve 2003 fight).  On information and belief,
26   FEG is not financially capable of paying Mr. Gracie U.S. $6,000,000 for three
27   fights.  Accordingly, Dream Stage remained very skeptical regarding whether the
28   FEG Document was a bona fide offer.  Dream Stage's primary concern was that the

1  "offer" was not bona fide and actually intended to force Dream Stage to overpay Mr.
2  Gracie to fight in Japan on New Year's Eve 2004 in an event promoted by Dream
3  Stage.

4      19.   On or around November 2, 2004, six days after receiving the FEG
5  Document via e-mail, Mr. Connette sent Mr. Gracie's agent, Mr. Kogan, an e-mail
6  stating that Dream Stage still had doubts regarding whether the FEG Document was
7  a bona fide offer. Mr. Connette suggested that Mr. Gracie ask FEG to sign the FEG
8  Document and give Mr. Gracie "X" number of days to accept it, so that Mr. Gracie
9  truly would have the power to accept the "offer" should Dream Stage not match it
10  pursuant to Section 5 of the Agreement. Dream Stage's request for a firm offer with
11  complete terms that gives Mr. Gracie the legal power of acceptance was reasonable.
12  If Dream Stage blindly accepted Mr. Gracie's contention that the FEG Agreement
13  was a bona fide offer, Dream Stage would be vulnerable to overpaying Mr. Gracie
14  to match an illegitimate or illusory "offer" made by Dream Stage's chief competitor,
15  FEG.

16      20.   On or around November 2, 2004, by telephone, Mr. Kogan admitted to
17  Mr. Connette that he repeatedly asked FEG to sign the FEG Document, but that
18  FEG repeatedly refused to sign it. In that same telephone conversation, Mr. Kogan
19  acknowledged that FEG probably would "not stick to the terms" of the FEG
20  Document. This interaction compounded Dream Stage's doubts regarding whether
21  the FEG "offer" was bona fide.

22      21.   On or around November 2, 2004, Mr. Gracie's agent, Mr. Kogan, sent
23  an e-mail to Mr. Connette refusing to provide additional details regarding the
24  purported "offer" from FEG to fight in an event in Japan on December 31, 2004.
25  Instead, Mr. Kogan stated that if he did not hear from Dream Stage in writing and/or
26  e-mail by Midnight on November 12, 2004, he will "consider Mr. Royce Gracie
27  released from any contractual obligations to [Dream Stage] and all of the previsions
28  of Section 5 satisfied." Mr. Gracie, through his agent, abruptly ended discussions

1   with Dream Stage, declared the FEG Document a bona fide offer, and set forth a 10
2   business day deadline from November 2, 2004 for Dream Stage to exercise its right
3   of first refusal under Section 5 of the Agreement.

4   　　　22.   During the 10 business day matching period, Dream Stage was aware
5   of several sports publications that reported that Akebono, Mr. Gracie's opponent
6   under the FEG Document, was to fight another sumo wrestler on December 31,
7   2004.  This information compounded Dream Stages' doubts regarding whether the
8   FEG offer was bona fide.

9   　　　23.   On information and belief, Mr. Gracie (and Mr. Kogan on his behalf)
10  intentionally withheld important details regarding the purported "offer" from FEG,
11  making it impossible for Dream Stage to exercise its right of first refusal without
12  taking on an unacceptable, and unintended in the Agreement, level of risk.

13  　　　24.   On information and belief, FEG knew that Dream Stage had the right of
14  first refusal over any bona fide offer to fight in Japan made on or before December
15  31, 2004.  Dream Stage further alleges that FEG encouraged Mr. Gracie to withhold
16  from Dream Stage important details regarding the purported "offer" from FEG, in an
17  effort to "run out the clock" on Dream Stage's right of first refusal, so FEG could
18  sign Mr. Gracie to the lucrative and prestigious New Year's Eve 2004 fight.

19  　　　25.   On November 11, 2004, one day before the November 12, 2004
20  expiration of the right of first refusal, Sotaro Shinoda, Vice President of
21  International Operations for Dream Stage, sent Mr. Gracie's agent, Mr. Kogan, a
22  letter by post, facsimile and e-mail, that expressly exercised Dream Stage's right of
23  first refusal pursuant to Section 5 of the Agreement before the November 12, 2004
24  deadline created by Mr. Gracie (even though Dream Stage was still unsure whether
25  the "offer" was bona fide).  Dream Stages' November 11, 2004 letter states plainly:

26  　　　　　Please be advised that Dream Stage Entertainment, Inc. (DSE)
27  　　　　　is exercising its right of first refusal on the terms of the FEG,
28  　　　　　Inc. 'offer' subject to section 5 of the agreement between DSE

and Royce Gracie, and subject to FEG, Inc.'s "offer" being a bona fide offer....

26.    On or around November 11, 2004, Mr. Gracie's agent, Mr. Kogan, sent a letter to Mr. Shinoda and Mr. Connette acknowledging receipt of Dream Stage's November 11, 2004 letter, in which Dream Stage expressly exercised its right of first refusal, and stating that Mr. Gracie nevertheless intends to sign the FEG Document. In the November 11, 2004 letter, Mr. Kogan attempts to dismiss Dream Stage's November 11, 2004 letter by misinterpreting its very clear language. Mr. Kogan asserts that when Dream Stage said "Please be advised that Dream Stage Entertainment, Inc. (DSE) is exercising its right of first refusal on the terms of the FEG, Inc. 'offer' subject to section 5 of the agreement between DSE and Royce Gracie," Dream Stage was really asking to extend the deadline to exercise the right of first refusal. Mr. Kogan's interpretation is incredible—apparently confusing the plain statement that "[Dream Stage] is exercising its right of first refusal" with "Dream Stage would like to extend the deadline to exercise its right of first refusal."

27.    On information and belief, FEG has at all relevant times been aware that Dream Stage exercised its right of first refusal to match FEG's "offer" for Mr. Gracie to fight in Japan on December 31, 2004. Dream Stage notified FEG in writing that Dream Stage had exercised its right of first refusal before FEG signed Mr. Gracie to fight. Moreover, FEG is still going ahead with the fight, thus giving Mr. Gracie the opportunity, means, and incentive to breach the Agreement.

28.    On information and belief, after November 11, 2004, Mr. Connette was unable to contact Mr. Gracie's agent, Mr. Kogan, on his mobile telephone. Mr. Connette was trying to contact Mr. Kogan to discuss the details of the FEG "offer" so Dream Stage could match the "offer" pursuant to the terms of Section 5 of the Agreement.

1      29.    On or about November 17, 2004, Mr. Connette sent Mr. Gracie's agent,
2  Mr. Kogan, an e-mail stating that he has been unable to contact him on his mobile
3  telephone and that he and Mr. Gracie had misunderstood Dream Stage's November
4  11, 2004 letter, which clearly stated that Dream Stage is "exercising its right of first
5  refusal" pursuant to Section 5 of the Agreement.  Mr. Connette also advised Mr.
6  Gracie not to sign the FEG Document because it would constitute a breach of the
7  Agreement now that Dream Stage had expressly exercised its right of first refusal in
8  Dream Stage's November 11, 2004 letter.

9      30.    On or about November 19, 2004, despite Dream Stage's express written
10  exercise of its option, Mr. Gracie, through his agent Mr. Kogan, sent a letter to
11  Dream Stage stating that Dream Stage had failed to exercise its right of first refusal
12  under Section 5 of the Agreement and Mr. Gracie intends to sign the FEG
13  Document.  On information and belief, Mr. Gracie has since signed the FEG
14  Document and plans to fight in Japan on December 31, 2004 in an event promoted
15  by FEG.

16                              **FIRST CLAIM FOR RELIEF**

17                          **(Breach of Contract against Mr. Gracie)**

18      31.    Dream Stage incorporates the allegations of paragraphs 1 through 28
19  above.

20      32.    Dream Stage and Mr. Gracie entered into the Agreement on December
21  30, 2003, pursuant to which Mr. Gracie agreed to fight in Japan on December 31,
22  2003 in an event promoted by Dream Stage.  Section 5 of the Agreement provides
23  Dream Stage, for one year after the December 31, 2003 fight, with the right of first
24  refusal regarding any offer by a third party received prior to December 31, 2004 for
25  Mr. Gracie to fight in Japan.

26      33.    Dream Stage has performed all of its obligations under the Agreement
27  that are required to be performed by Dream Stage.  Dream Stage remains ready and
28  willing to perform all of its outstanding obligations under the Agreement.

1    34.    Mr. Gracie purported to receive a bona fide offer from FEG to fight in
2    Japan on December 31, 2004.  Despite a disagreement over whether the offer was
3    bona fide, as required by the Agreement, Mr. Gracie and Dream Stage agreed in
4    writing that Dream Stage would  have through November 12, 2004 to exercise its
5    right of first refusal.

6    35.    On November 11, 2004, Dream Stage sent Mr. Gracie a letter expressly
7    exercising its right of first refusal, stating plainly: "Please be advised that Dream
8    Stage Entertainment, Inc. (DSE) is exercising its right of first refusal on the terms of
9    the FEG, Inc. 'offer' subject to section 5 of the agreement between DSE and Royce
10   Gracie."

11   36.    Mr. Gracie breached Section 5 of the Agreement when, after
12   acknowledging receipt of Dream Stage's November 11, 2004 letter, exercising its
13   right of first refusal, he nevertheless signed the FEG Document to fight in Japan on
14   December 31, 2004 in an event promoted by FEG.[1]

15   37.    Dream Stage further alleges that Mr. Gracie's breach of contract will
16   cause Dream Stage irreparable harm unless Mr. Gracie is ordered to specifically
17   perform his obligations under Section 5 of the Agreement and is enjoined from
18   fighting in Japan on December 31, 2004 in an event promoted by FEG, and is
19   enjoined from participating in the other two undated fights referenced in the FEG
20   Document.  Dream Stage has no adequate remedy at law and money damages
21   cannot fully compensate Dream Stage for the injury to its business.  In Section 14 of
22   the Agreement, Mr. Gracie himself acknowledges and agrees that his services are of
23   a "special, unique, unusual and extraordinary character, giving them peculiar value,
24   the loss of which cannot be reasonably and adequately compensated by damages in
25   an action at law and would cause [Dream Stage] irreparable injury and damage."

26   _____
[1] In the event discovery reveals that the FEG "offer" was not bona fide, Mr. Gracie
27   will have engaged in fraud, and Dream Stage will seek leave to amend this
     Complaint accordingly.
28

1  Dream Stage is thus entitled to specific performance of Section 5 of the Agreement
2  and injunctive relief prohibiting Mr. Gracie from fighting in Japan on December 31,
3  2004 in an event promoted by FEG, and is enjoined from participating in the other
4  two undated fights referenced in the FEG Document.

5      38.    As a proximate result of Mr. Gracie's conduct, Dream Stage has
6  suffered damages in an amount to be determined according to proof at trial.

### SECOND CLAIM FOR RELIEF

**(Breach of Covenant of Good Faith and Fair Dealing against Mr. Gracie)**

9      39.    Dream Stage incorporates the allegations of paragraphs 1 through 36
10 above

11     40.    Dream Stage and Mr. Gracie entered into the Agreement on December
12 30, 2003, pursuant to which Mr. Gracie agreed to fight in Japan on December 31,
13 2003 in an event promoted by Dream Stage.  Section 5 of the Agreement provides
14 Dream Stage, for one year after the December 31, 2003 fight, with the right of first
15 refusal regarding any offer by a third party received prior to December 31, 2004 for
16 Mr. Gracie to fight in Japan.

17     41.    California law implies a covenant of good faith and fair dealing in all
18 contracts between parties entered into in the State of California.

19     42.    Mr. Gracie purported to receive a bona fide offer from FEG to fight in
20 Japan on December 31, 2004.  Despite a disagreement over whether the offer was
21 bona fide, as required by the Agreement, Mr. Gracie and Dream Stage agreed in
22 writing that Dream Stage would  have through November 12, 2004 to exercise its
23 right of first refusal.

24     43.    On November 11, 2004, Dream Stage sent Mr. Gracie a letter expressly
25 exercising its right of first refusal, stating plainly: "Please be advised that Dream
26 Stage Entertainment, Inc. (DSE) is exercising its right of first refusal on the terms of
27 the FEG, Inc. 'offer' subject to section 5 of the agreement between DSE and Royce
28 Gracie."

1      44.   Mr. Gracie breached the implied covenant of good faith and fair
2  dealing when he intentionally withheld full details of the purported "offer" from
3  Dream Stage and refused to discuss specifics about that "offer," making it
4  impossible for Dream Stage to exercise its right of first refusal without taking on
5  substantial risk that the offer was not bona fide. Dream Stage further alleges that
6  Mr. Gracie knowingly mischaracterized Dream Stage's exercise of the right of first
7  refusal, asserting that when Dream Stage said "[Dream Stage] is exercising its right
8  of first refusal," Dream Stage was really asking to extend the deadline to exercise
9  the right of first refusal. Mr. Gracie mischaracterized Dream Stage's exercise of the
10  right of first refusal to evade his obligations under the Agreement.

11      45.   Dream Stage further alleges that Mr. Gracie's breach of the implied
12  covenant of good faith and fair dealing will cause Dream Stage irreparable harm
13  unless Mr. Gracie is enjoined from fighting in Japan on December 31, 2004 in an
14  event promoted by FEG, and is enjoined from participating in the other two undated
15  fights referenced in the FEG Document. Dream Stage has no adequate remedy at
16  law and money damages cannot fully compensate Dream Stage for the injury to its
17  business. In Section 14 of the Agreement, Mr. Gracie himself acknowledges and
18  agrees that his services are of a "special, unique, unusual and extraordinary
19  character, giving them peculiar value, the loss of which cannot be reasonably and
20  adequately compensated by damages in an action at law and would cause [Dream
21  Stage] irreparable injury and damage." Dream Stage is thus entitled to injunctive
22  relief prohibiting Mr. Gracie from fighting in Japan on December 31, 2004 in an
23  event promoted by FEG, and is enjoined from participating in the other two undated
24  fights referenced in the FEG Document.

25      46.   As a proximate result of Mr. Gracie's conduct, Dream Stage has
26  suffered damages in an amount to be determined according to proof at trial.

27

28

1

## **THIRD CLAIM FOR RELIEF**

2

### **(Intentional Interference with Contractual Relations against FEG)**

3       47.    Dream Stage incorporates the allegations of paragraphs 1 through 44

4  above.

5       48.    Dream Stage alleges that, at all relevant times, FEG was aware of the

6  Agreement between Dream Stage and Mr. Gracie, including Dream Stage's right of

7  first refusal pursuant to Section 5 of the Agreement.

8       49.    Dream Stage further alleges that FEG encouraged Mr. Gracie to

9  withhold from Dream Stage important details regarding the purported "offer" from

10  FEG, in an effort to "run out the clock" on Dream Stage's right of first refusal.

11  Dream Stage further alleges that FEG has at all relevant times been aware that

12  Dream Stage exercised its right of first refusal to match FEG's "offer" for Mr.

13  Gracie to fight in Japan on December 31, 2004.   Nonetheless, FEG is still going

14  ahead with the fight, thus giving Mr. Gracie the opportunity, means, and incentive to

15  breach the Agreement.

16       50.    Dream Stage further alleges that FEG's conduct complained of herein

17  interfered with Dream Stage's contractual relationship with Mr. Gracie, resulting in

18  Mr. Gracie breaching the Agreement when he refused to allow Dream Stage to

19  exercise its right of first refusal and agreed to fight in a FEG-promoted event in

20  Japan on New Year's Eve 2004.   In addition, in the event FEG's "offer" was not a

21  bona fide offer and it did not intend to perform, its conduct did and was intended to

22  make Dream Stage's performance under the Agreement more expensive, namely to

23  make Dream Stage pay a total of U.S. $6,000,000 for three fights, when Dream

24  Stage previously acquired such services for less than one-third the price.

25       51.    Dream Stage further alleges that FEG has continued to engage in and/or

26  will benefit from the conduct complained of herein and, unless enjoined, FEG will

27  continue to do so, causing Dream Stage irreparable harm.   Dream Stage has no

28  adequate remedy at law and money damages cannot fully compensate Dream Stage

1 for the injury to its business. Dream Stage is thus entitled to injunctive relief
2 prohibiting FEG from continuing to interfere with Dream Stage's contractual
3 relationships, including without limitation from continuing to encourage or
4 otherwise assist Mr. Gracie to breach Dream Stage's right of first refusal pursuant to
5 Section 5 of the Agreement. To this end, Dream Stage is entitled to injunctive relief
6 prohibiting FEG from engaging in promotional activities relating to Mr. Gracie
7 fighting in Japan on or before December 31, 2004 in an event sponsored by FEG.

8     52. As a proximate result of FEG's conduct, Dream Stage has suffered
9 damages in an amount to be determined according to proof at trial.

10     53. FEG's conduct was and is fraudulent, malicious, oppressive, and in
11 willful disregard of Dream Stage's rights. Dream Stage is therefore entitled to
12 exemplary damages against FEG under California Civil Code, Section 3294.

14 **PRAYER FOR RELIEF**

15 Dream Stage prays for judgment against Mr. Gracie and FEG as follows:

16     54. For an order that Mr. Gracie (and his respective officers, agents,
17 servants, employees, attorneys, and all those acting in concert with or participating
18 with any and all of them who receive actual notice of the Court's order or otherwise)
19 specifically perform Section 5 of the Agreement;

20     55. For preliminary and permanent injunctive relief prohibiting:

21     (a) Mr. Gracie (and his respective officers, agents, servants,
22 employees, attorneys, and all those acting in concert with or participating with any
23 and all of them who receive actual notice of the Court's order or otherwise) from
24 fighting in Japan on December 31, 2004 in an event promoted by FEG, and is
25 enjoined from participating in the other two undated fights referenced in the FEG
26 Document; and

27     (b) FEG (and its respective officers, agents, servants, employees,
28 attorneys, and all those acting in concert with or participating with any and all of

1  them who receive actual notice of the Court's order or otherwise) from continuing to

2  interfere with Dream Stage's contractual relationships, including without limitation

3  from performing under the FEG Document, continuing to encourage, assist or

4  provide the means to Mr. Gracie to breach Dream Stage's right of first refusal

5  pursuant to Section 5 of the Agreement and enjoining FEG from engaging in any

6  promotional activities relating to Mr. Gracie fighting in any of the three fights

7  outlined in the FEG Document, including the fight in Japan on December 31, 2004;

8  and

9      56.    For actual and compensatory damages (including consequential

10  damages) from both Mr. Gracie and FEG in an amount to be determined according

11  to proof at trial.

12     57.    For exemplary damages against FEG under California Civil Code,

13  Section 3294.

14     58.    For attorney's fees and costs from Mr. Gracie to the extent permitted by

15  law and the Agreement sued upon.

16     59.    For such other and further relief as the Court may allow.

17

18  DATED:  November 29, 2004

19                          SHEPPARD MULLIN RICHTER & HAMPTON LLP

20

21                  By

22                          TAWNYA WOJCIECHOWSKI

23                          Attorneys for Plaintiff
24                          DREAM STAGE ENTERTAINMENT, INC.

25

26

27

28

1

2          **DEMAND FOR JURY TRIAL**

3          Plaintiff Dream Stage Entertainment, Inc. hereby demands a jury trial on all

4    issues triable by jury.

5

6    DATED:  November 29, 2004

7                              SHEPPARD MULLIN RICHTER & HAMPTON LLP

8

9                              By _____

10                                  TAWNYA WOJCIECHOWSKI

11                                   Attorneys for Plaintiff
12                              DREAM STAGE ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28